POWER CURBERS, INC., Appellee,

v.

E. D. ETNYRE & CO. and A. E. Finley & Associates, Inc., Appellants.

No. 8293.

United States Court of Appeals
Fourth Circuit.

Argued April 14, 1961.

Decided Jan. 3, 1962.

Richard Russell Wolfe, Chicago, Ill. (Channing L. Richards, Charlotte, N. C., Jarrett Ross Clark, Chicago, Ill., Phillip H. Mayer, Washington, D. C., and Franklin M. Crouch, Chicago, Ill., on brief), for appellants.

85

Paul B. Bell, Charlotte, N. C. (Wm. Clarence Kluttz, Salisbury, N. C., Eaton, Bell, Hunt & Seltzer, Charlotte, N. C., and Kluttz and Hamlin, Salisbury, N. C., on brief), for appellee.

Before SOBELOFF, Chief Judge, and HAYNSWORTH and BOREMAN, Circuit Judges.

BOREMAN, Circuit Judge.

This is a suit for infringement of Claims 1, 3 and 4[1] of Canfield Patent No. 2,707,422, for damages and for an injunction, instituted in the United States District Court for the Western District of North Carolina by Power Curbers, Incorporated, a North Carolina corporation which was formed for the purpose of manufacturing and selling the patented machines, against A. E. Finley & Associates, Incorporated, the distributor and sales agent in North Carolina for E. D. Etnyre & Company, of Oregon, Illinois, and Everett, Massa-

[1]. "1. Apparatus for forming strips of paving material, such as curbs and the like, on a surface, comprising a framework having a hopper thereon into which paving material is adapted to be placed, a horizontally disposed pipe disposed below the hopper and secured to and extending longitudinally of the framework and communicating intermediate its ends with the lower end of the hopper, the front end of the pipe being closed and the rear end being open, an elongated mold secured to and extending longitudinally of the framework and being open at both ends and having sidewalls extending downwardly into close proximity to the surface which supports the framework and having its front end connected to the open rear end of said pipe, said framework having a pair of vertically adjustable wheels near its rear end for supporting the rear end of the framework clear of a surface on which it is disposed and having at least one front wheel, a screw conveyor in said pipe, means for driving the screw conveyor to force paving material from the hopper into said mold under pressure to pack the paving material into the mold and, due to the pressure exerted on the paving material by the screw conveyor, to move the apparatus forwardly at a rate of travel directly proportional to the amount of paving material forced into the mold.

*    *    *    *    *

"3. Apparatus for forming raised strips of paving material such as curbs and the like on a surface, comprising a wheeled framework having a hopper thereon into which paving material is adapted to be placed, a horizontally disposed and longitudinally extending pipe disposed below the hopper and communicating intermediate its ends with the lower end of the hopper, the front end of the pipe being closed and the rear end being open, an elongated mold substantially of an inverted U-shape in cross-section and open at both ends and having its front end secured to the rear end of the pipe and having sidewalls extending downwardly into close proximity to the surface which supports the framework, vertically adjustable wheels mounted in the framework for adjusting the vertical position of the frame relative to the surface on which it is supported, a screw in said pipe, means for driving the screw to force paving material from the pipe into said mold under pressure to pack the paving material into the mold and, due to the pressure exerted on the paving material by the screw, to move the apparatus forwardly at a rate of travel directly proportional to the amount of paving material forced into the mold.

"4. Apparatus for forming strips of paving material such as curbs and the like on a surface comprising a framework having a front end and a rear end and having a hopper thereon into which paving material is adapted to be placed, a horizontally disposed pipe disposed and longitudinally extending below the hopper and communicating with the lower end of the hopper, the rear end of the pipe being open, an elongated mold mounted in and extending longitudinally of the framework and being open at both ends and at its bottom and having sidewalls extending downwardly into close proximity to the surface which supports the framework, the front end of the mold being secured to the rear end of the pipe, a screw in said pipe, a plurality of wheels mounted in the framework for holding all portions of the framework out of contact with the surface over which the framework is adapted to travel, means for driving the screw to force paving material flowing from the hopper by gravity into said mold under pressure to pack the paving material into the mold and, due to the pressure exerted on the paving material by the screw, to move the apparatus forwardly at a rate of travel directly proportional to the amount of paving material forced into the mold."

chusetts. Sometime after the suit was instituted Etnyre, the manufacturer of the machines alleged to infringe, intervened and thereafter conducted the defense of the suit. Both defendants assert the defenses of invalidity and non-infringement. The District Court held that the Canfield patent is valid; that Etnyre had literally copied the patented machine; that Claims 1, 3 and 4 were infringed by defendants and that plaintiff is entitled to damages and injunctive relief. Defendants were adjudged liable for the payment of plaintiff's attorney fees.

The Canfield invention is a self-contained machine for automatically laying, in place, finished asphalt or cement curbing of uniform compaction free of voids and honeycombs. It is claimed that the machine provides for this purpose a *new combination* of elements, functioning together, namely: An adjustable *wheeled frame*, having a *hopper* and an elongated curb *mold* connected together by a *pipe* containing a *screw* which is powered by *driving means* and which takes material from the hopper and then compacts, conveys and *extrudes it under pressure directly into the mold* where it is shaped and worked into the form of a curb which is surface finished by movement of the mold over the formed curb; that the machine is propelled forwardly by the reactive force of the extrusion[2] of curbing material in proportion to the amount of material forced into the mold.

Plaintiff explains that suitable material, such as asphalt or concrete, is placed in the hopper which directs it into the front end of the pipe which forms the lower part of the hopper. Thereafter, it is conveyed by the screw into the pipe and screw extrusion device. It is claimed that at this point the material is compacted tightly and then extruded under pressure from the end of the pipe and packed directly into the inverted U-shaped mold; that initially the rear end of the mold is held closed, by a

shovel or other appropriate implement, until the mold is packed tightly with material forming a curb abutment on the ground surface toward the rear of the machine; as the extrusion device forces additional material into the mold against the abutment, the reactive force causes the machine to move forward in proportion to the amount of additional material which is extruded into the mold; as the machine moves forward, the mold retains the formed curb to prevent buckling or disintegration and also serves to finish the surface of the curb.

W. E. Canfield was an employee of the Highway Department of the State of North Carolina. He was familiar with the methods and costs, the materials then being generally used and the problems arising in connection with curb building. His original patent application was filed on February 15, 1953. The plaintiff corporation was organized in that year, initially called "The Canfield Corporation" and later "E. L. Hardin Associates, Inc," before taking its present name. The patent in suit was issued on May 3, 1955, but prior to that date Canfield assigned his interest to plaintiff. The District Court found that Power Curbers, Inc., is the owner of patent No. 2,707,422 and has been such owner since the patent issued.

Prior to the issuance of the patent in suit, one O. K. Stephens, also of the North Carolina Highway Department, built a screw type curb-making machine and applied for a patent. His application and Canfield's became involved in an interference proceeding in the Patent Office but the parties agreed upon a settlement, the application of Stephens was withdrawn and the Canfield patent issued shortly thereafter.

In 1953 one George F. Patterson of Massachusetts, superintendent of a company engaged in the asphalt contracting business, built, from scrap parts, a screw type curb-making machine which was used to some extent early in 1954. Pat-

---

2. Plaintiff's and defendants' experts defined extrusion as forcing material under pressure through an opening or die; in this case, the end of the pipe.

terson apparently was not satisfied or impressed with results. An officer of defendant Etnyre saw the Patterson machine in Massachusetts late in 1954 and had it shipped to Etnyre's plant in Illinois. Etnyre determined that a salable machine of that type could be made and set about to design one for manufacture.

From the evidence, the District Court made certain findings of fact as follows:

"The idea for a curb laying machine occurred to W. E. Canfield * * * in August, 1951. North Carolina in its road construction had for some time been stepping up its use of curbing for directing traffic through the use of channel islands and other engineering projects, and this use obviously pointed up the problems involved in curb laying,— which was necessarily a slow and expensive project and the progress of the Highway building had been materially slowed through the years on that account. Until the Canfield idea came into being stationary forms were used for cement curbs, —granite on occasion was used,— but asphalt curbs were relatively unknown in view of the virtual impossibility up until this time of achieving a satisfactory result.

"After several attempts to produce a workable machine Canfield, in May of 1952, completed a machine which was found capable of satisfactorily laying both cement and asphalt curbing. Following a demonstration which proved highly successful certain machines based on the Canfield process, as disclosed in the patent in suit, were used during the months of May through October 1952, by the North Carolina State Highway Department to form many curbs and traffic islands over the entire North Carolina Highway System. In 1953 plaintiff began the general manufacture and sale of machines based on the ideas embraced in the Canfield patent. Subsequently sales became not only nationwide but many were sold in foreign countries. Trade journals and magazines, many of those in which Etnyre regularly advertised its products, carried advertisements of the Canfield machine, and set forth its claims and results." [3]

There was evidence that by mid-1954 machines made in accordance with the Canfield invention had achieved substantial and growing success and had been widely publicized, demonstrated, sold and used throughout a large portion of the United States and in the areas around Etnyre's principal office in Illinois and its branch plant in Massachusetts. Etnyre is engaged on a large scale in the business of manufacturing and selling various types of road construction machinery. It denied any knowledge of the Canfield machine prior to January 1955, admitting, however, that by that time it had received literature marked "Patent Pending" describing the Canfield machine. Etnyre had not then started manufacturing its curb machine. It was testified by the officer in charge of Etnyre's research and development that "before we actually built the physical components of our machine, we did know about the Canfield machine." * * * "Q. Before you ever made any part of your machine? A. That is correct." In April of 1955 Etnyre was still engaged in the development of its curb paver.

The District Court found further that: Etnyre began manufacturing and selling the accused machine, known as the "Etnyre Curb Paving Machine," in June of 1955; in early January of that year, Etnyre was fully aware of the Canfield machine and knew that application for a patent had been filed and was pending in the Patent Office; in April 1955 certain attorneys representing Etnyre wrote plaintiff seeking to obtain further information about the patent in

3. Power Curbers, Incorporated v. E. D. Etnyre & Company, 187 F.Supp. 819, at 820–821 (W.D.N.C.1960).

488

suit; subsequently Etnyre was advised by plaintiff that the Canfield patent had issued to it on May 3, 1955, and Etnyre was warned not to infringe; in October 1955 Etnyre sought to obtain a license to manufacture and sell under plaintiff's patent but after lengthy negotiations its request was denied; the working elements of the plaintiff's machine, made under the patent in suit, must have been literally copied and produced by the defendant, Etnyre, with variations tending only to confusion.

It appears from evidence introduced over defendants' strenuous objection that about three months after the institution of this suit and before filing answer, Etnyre proceeded, through its own attorneys, to cause an application to be filed in the Patent Office, in the name of George Francis Patterson as inventor, for a patent for a Curb Paver Machine. The court's attention was directed to certain drawings, designated figures 1 and 3, filed with the application which were claimed by plaintiff to represent the Etnyre machine then in manufacture with features similar to plaintiff's machine and others which Etnyre had incorporated therein different from and in addition to those of the plaintiff's machine. The plaintiff charges that even though this application was not filed for more than a year after Etnyre commenced sales of machines embodying the features sought to be patented, Patterson subscribed to an oath prepared for him in which he stated that the invention had not been "in public use or on sale in the United States for more than one year prior to this application." Later, however, the application of Patterson was abandoned and the Patent Office was advised as follows:

"As an incident to litigation which involved in part, the machine disclosed and claimed in this application, it was discovered that the first commercial machine of this type had been sold more than one year prior to the filing date of this application.

"In view of this, applicant desires to, and hereby does, specifically abandon this application.

/s/ "GEORGE FRANCIS PATTERSON"

The defendants contend that claims 1, 3 and 4 of the patent in suit are combination claims in which all of the elements of the combination are old and that they simply define an apparatus made up of old parts. They argue that the function of a patent is to add to the sum of usable knowledge; that this patent is invalid and cannot be sustained when its effect is merely to subtract from former resources well known to the art and freely available to skilled artisans; that Canfield merely brought together segments of prior art and plaintiff is not entitled to claim them in congregation as a monopoly.

PRIOR ART

The original application of Canfield contained a total of eighteen claims. Seven United States patents were cited as references and considered by the Patent Office.[4] The defendants introduced

| 4. Name | Number | Date |
|---|---|---|
| Howson | 291,849 | Jan. 8, 1884 |
| McIntyre | 817,383 | Apr. 10, 1906 |
| Sansome | 1,090,229 | Mar. 17, 1914 |
| Fraisher | 1,193,459 | Aug. 1, 1916 |
| Palmer | 1,877,577 | Sept. 13, 1932 |
| Lebelle | 2,225,015 | Dec. 17, 1940 |
| Heltzel | 2,636,425 | Apr. 28, 1953 |

in evidence at the trial several additional prior art patents [5] and one text book.[6] They rely here most heavily upon McIntyre, No. 817,383, which was a 1906 paper patent, one considered and rejected by the Patent Office during the prosecution of the Canfield application. Defendants' own expert witness, in discussing the patents introduced in evidence, expressed the opinion that McIntyre is the closest prior art patent.

In its findings concerning prior art patents, the District Court (187 F.Supp. 819, at 822 and 823) stated:

"Defendants rely upon thirteen patents and one publication in support of their contentions that the claims of the patent in suit are invalid.

"Seven of these patents were considered by the Patent Office during the prosecution of the application for the patent herein; and none of the additional prior arts, patents or the publication disclose anything more pertinent than the seven patents considered by the Patent Office. Certainly none other than the McIntyre patent No. 817,383 could be considered in the slightest as disclosing anything pertinent. The McIntyre patent being one considered and cited by the Patent Office infers that the device shown might be used for curb laying but does not teach any means which modify the device so as to accomplish such result. This patent shows a rather crude impractical arrangement and actually shows only one element, the hopper, which is in any wise comparable to the Canfield patent. A study reveals that it is a far cry from what is contained in the claims of the patent in suit. The other six patents all considered by the Patent Office relate either to a shape making machine or other circumstances which in no wise compare to the Canfield patent. It clearly is made to appear that none of these patents could be operated in any wise to lay curb. None were ever marketed, sold, put into public or commercial use, or operated for any of the purposes stated in the patents."

The McIntyre patent relates generally to an apparatus for molding plastics by what is described as a continuous process, the invention being particularly "applicable in connection with machines for molding pipes, flumes, curbing and the like, *in situ*, the machine traveling progressively and molding the material into the required shape as it deposits said material in place." Thus in a statement of its broad objects, there is a passing reference to curbs.

It is true that the machine of the McIntyre patent is a combination of elements quite similar in some respects to the elements of the patent in suit. McIntyre shows a framework, a hopper and a horizontally disposed tubular casing or pipe extending longitudinally of the framework and communicating intermediate its ends with the lower end of the hopper. Within the tubular casing or pipe is a screw conveyor which is powered by a "suitable gear for driving the same by any suitable motive power." The front end of the pipe is closed and the rear end is open. Two alternatively usable molds are shown, one a pipe mold and the other an open-bottomed, elongated mold secured to and extending longitudinally of the framework. As to curb making the McIntyre patent states:

" * * * any desired molding devices may be used, the same being connected to the discharge or delivery end of the tubular casing to

| 5. Name | Number | Date |
|---|---|---|
| Dockery | 938,223 | Oct. 26, 1909 |
| Wiggins | 952,489 | Mar. 22, 1910 |
| Stump | 1,058,642 | Apr. 8, 1913 |
| Carr & Routhe | 1,153,599 | Sept. 14, 1915 |
| Foster | 1,606,160 | Nov. 9, 1926. |

6. Modern Brickmaking by Alfred B. Searle (1931 Ed.).

490

receive the material discharged therefrom and mold it into the desired shape."

" * * * The operation for forming a curb would be substantially identical with that above described, the mold being correspondingly shaped in obvious manner."

McIntyre's device has a single front roller which is steerable although not vertically adjustable. The sidewalls of the mold extend to and are intended to slide over the ground. Other than the front roller, there are no wheels attached to any part of the device.

In their brief, the defendants are seemingly critical of the District Court as reflected in the following statement: "The entire group of prior art patents are dismissed by the Court below as follows:". This statement precedes the second paragraph of that portion of the court's opinion which is hereinbefore quoted and found at 187 F.Supp. 819, 822 and 823. We are moved to observe that if the defendants did not direct the attention of the court below to the prior art patents on which they rely more fully and particularly than they have in briefs and arguments before this court, such criticism is wholly unjustified. Here they dwell at length upon McIntyre but indulge in little more than passing references to the other patents cited by the Patent Office and the additional ones introduced into evidence. They do urge, however, that both the Wiggins and Dockery patents show the use of wheels and that the patent in suit would not have issued if Wiggins and Dockery had been considered in the course of proceedings in the Patent Office. In view of the obvious lack of reliance by defendants upon prior patents other than McIntyre, we deem it unnecessary to review those patents in detail since we find them no more significant than did the District Court. However, the vertically adjustable wheels mounted on the framework of the plaintiff's machine and as described in the claims of the patent in suit will be hereinafter discussed in another portion of this opinion.

Returning to consideration of the McIntyre patented device as compared with the patented machine of the plaintiff, McIntyre states that the material enters the mold sections "in a comparatively loose state" and is packed into the lower part of the mold by gravity. McIntyre shows a tubular member or casing through which the material passes which flares or increases in diameter from the hopper end toward the delivery end, with the feeding-screw correspondingly increasing in diameter. In McIntyre, there is interposed between the diverging wall chamber and mold an intermediate member in the form of a downwardly extending element which, according to expert opinion testimony, would act to dissipate any pressure which might have been built up in the material. There is no disclosure or suggestion in McIntyre that a mold of any shape could be connected directly to the pipe in which the screw operates. In the patent in suit, the hopper connects with an elongated pipe "in which a driven screw is provided for propelling the paving mixture rearwardly of the pipe. The pipe is communicatively connected to a form preferably of generally inverted U-shaped cross-sectional configuration, though other types of forms may be employed." The rear end of the said form or mold is open and, "when the screw is driven, the paving material is forced into the form and temporary restraining means will be employed, like a shovel, to close the rear end of the form during initial operation of the apparatus after which said restraining means is removed whereby the packing material will be *packed* into the form and the *force* of the screw *in packing the material into the form* will propel the apparatus along a pavement onto which the curb is being deposited * * *." (Emphasis supplied.)

If operable at all, the McIntyre device would appear to function exactly opposite to the combination claimed by inventor Canfield since the patent in suit provides for means for driving the screw to *force* paving material from the pipe

into the mold under such pressure as to pack the material into the mold. The McIntyre patent lay dormant for some fifty-five years without the device there shown (and described in the evidence as unworkable) being manufactured or put into use for any purpose—much less laying curb. Doubtless the District Court accepted, as compelling and convincing proof of inoperability of the McIntyre device, testimony that the machine built by Patterson had an intermediate member between the end of the trough and screw and the curb mold, which machine was abandoned. Furthermore, Etnyre, with a highly skilled engineering staff, built an experimental model with an intermediate member between the end of the screw-pipe and the curb mold but before building a production model this feature was eliminated.[7]

## PROCEEDINGS IN PATENT OFFICE IN CONNECTION WITH CANFIELD'S APPLICATION FOR PATENT IN SUIT

In the specifications of Canfield's application, it was a stated object of the invention to provide a "wheeled framework having skids which can be used instead of the wheels, if desired, for supporting the framework * * *." It was further explained that the front end of the framework was equipped with a pair of adjustable wheels which could be used to support the frame off of the pavement if desired or, when the wheels were raised, to allow siding bars of the framework to rest on the pavement to retard movement of the frame. Application claims 1, 2, 3, 5, 13 and 15 were amended following rejection by the examiner either because of indefiniteness or as unpatentable over prior art, and became patent claims 1 to 6 as finally allowed. The remaining twelve claims were canceled. In the first Patent Office action, the examiner stated as shown in footnote 8 below.[8]

The patentee, through counsel, acquiesced in this rejection and approved the examiner's analysis as shown in remarks accompanying the response to the first Patent Office action.[9]

7. Roger Etnyre testified as follows:
"Q. Before you ever built your production model, you had to eliminate that feature? A. (No response.)
"Q. You did eliminate that feature? A. We eliminated it by lowering the screw so you would have a straight push.
"Q. Yes. And hooked your mold right onto the end of the pipe. Is that correct? Similar to your— A. Yes."

8. "Claims 1, 5, 6, 9, 10, 11, 12, 13, 15 are rejected as indefinite. It is not believed that forward movement could be obtained by means of back pressure alone in the absence of a wheeled frame to reduce frictional resistance on the supporting surface.
"Claims 2, 3, 4, 5, 6, are rejected as indefinite. The mold must necessarily have its front end connected to the rear end of the pipe to function in the manner recited.
"Claim 4 is further rejected as indefinite. The location of the wheels necessary to the operation at the end of the claim should be recited.
"Claims 7, 8, 10, 12, 14 are rejected as indefinite. All structure necessary to the defined operation should be recited. For example, a vibrator such as that in Lebelle will pack materials into the mold but will not cause forward movement.
"Claims 7, 8, 10, 12 are also rejected on Lebelle substantially reading thereon. Functional statements have no structural significance.
"Claims 1–6 inclusive, 9, 11, 13 and 15 are further rejected as indefinite. The pipe must be longitudinally disposed to cause forward movement.
"Claims 1, 2, 4–13 inclusive, 16, 17, 18 are rejected as unpatentable over Lebelle combined with McIntyre or Howson. To broadly feed the Lebelle mold by means of a screw conveyor as in McIntyre or Howson would not involve invention. Obviously a back pressure would be created which would exert a forward force component. The shape of the mold is a matter of choice.
"Claims 1–18 inclusive are also rejected as unduly multiplied. To file unnecessary claims differentiating from each other in language or in immaterial details and with no material benefit to applicant is objectionable; see In re Spencer 1931 C.D. 224."

9. "* * * The Examiner hit the nail on the head when he stated in the first paragraph that back pressure alone in

As originally filed, Canfield sought claims, consistent with the specifications, on an apparatus which would slide on the ground as well as operate on wheels. These claims were application claims 4 and 14. Application claim 4 provided "vertically adjustable wheels mounted in the framework for adjusting the vertical positon of the frame relative to the surface on which it is supported, whereby at least a portion of the framework may be allowed to contact the surface on which it is disposed to offer greater resistance to forward movement of the framework." Claim 4 was canceled without comment after being rejected but it will be noted that patent claim 3 as allowed provides for "vertically adjustable wheels mounted in the framework for adjusting the vertical position of the frame relative to the surface on which it is supported."

Application claim 14 provided for an apparatus "having lower longitudinal frame members adapted to slide on the surface onto which the paving material is being deposited * * * and also having vertically adjustable wheels for moving the longitudinal members out of contact with said surface." Application claim 14 was amended in an attempt to overcome its first rejection and thereafter canceled when rejected "as unpatentable over McIntyre in view of Palmer and when further considering Lebelle." Of particular interest and pertinence is application claim 14 because, in addition to reciting "vertically adjustable wheels," it provided for an apparatus "having lower longitudinal frame members adapted to slide on the surface onto which the paving material is deposited."

Thus it is shown that, of the original eighteen claims, only six, including claims 1, 3 and 4 here claimed and found to be infringed, were ultimately allowed. Each of the six claims provides for the operation, on wheels, of the framework supporting the curb-laying machine. The two original application claims which made provision for the operation of the machine on skids or slides were canceled when rejected. It is clear that the applicant accepted the examiner's view that the skid-supported rear end of the machine would not work and that efforts to claim a skid-supported curber were abandoned.

## VALIDITY

■ Claims 1, 3 and 4 of the patent in suit are combination claims in which all of the elements of the combination are old. We do not understand the plaintiff to contend to the contrary. The District Court held:

"This patent in suit not only claims but actually discloses a new combination of elements functioning together in a new way and which unquestionably produces new and outstanding results; from which I am of the opinion and so find that the Canfield invention taken as a whole would not have been obvious to a person having ordinary skill in the art of paving apparatus." 187 F.Supp. 819, 822.

35 U.S.C.A. § 282 provides in part as follows:

"A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on a party asserting it. * * * "

Mere argument will not suffice to overcome this statutory presumption and to sustain the burden imposed upon the

the absence of a wheeled frame would not propel the apparatus forwardly. The drawings in this application were made from an actual machine which has been in use in laying curbs and that is the reason these wheels have been provided because it has been found that wheels are necessary, therefore the patents to McIntyre and Howson are not at all pertinent as neither of these machines will operate. All of the claims now have embodied therein wheels of various sorts and are therefore believed to be allowable."

\* \* \* \* \*

" * * * since all of them have wheels which are not shown in the references it is therefore believed that allowance of the claims is in order and such action is respectfully requested."

defendants who assert invalidity. The defendants' case on validity consists largely of the introduction of a number of old paper patents followed by the argument that the disclosures in such patents could be put together, modified, reconstructed, changed, or in some other way rearranged so as to create the same combination of elements as conceived and put into practical use by Canfield. The District Court rejected this argument and the defendants have failed to convince us that the District Court was in error in this respect. The fact that the defendants were unable to come up with any prior art more pertinent than the McIntyre patent strengthens the presumption of the validity of the patent in suit. As was said in Reynolds v. Whitin Mach. Works, 167 F.2d 78, 84 (4th Cir.), certiorari denied, 334 U.S. 844, 68 S.Ct. 1513, 92 L.Ed. 1768 (1948), " * * * patents for useful inventions ought not be invalidated and held for naught because of such excursions into the boneyard of failures and abandoned experiments." In Chesapeake & O. Ry. Co. v. Kaltenbach, 95 F.2d 801, 804 (4th Cir. 1938), this court held: " * * * [T]he presumption of validity is strengthened where, as here, the principal references urged against the patent have been considered by the Patent Office." See also Manville Boiler Co., Inc. v. Columbia Boiler Co. of Pottstown, Inc., 269 F.2d 600, 603 (4th Cir.), certiorari denied, 361 U.S. 901, 80 S.Ct. 208, 4 L.Ed.2d 156 (1959); Gulf Smokeless Coal Co. v. Sutton, Steele & Steele, 35 F.2d 433, 437 (4th Cir. 1929), certiorari denied, 280 U.S. 609, 50 S.Ct. 158, 74 L.Ed. 652 (1930).

There was evidence from which the District Court found that there was a long-existing need for some improvement in the means and methods of laying curbs. There was testimony to show the prompt and ready acceptance by the industry of the Canfield machine which tends to prove both the existence of the need and the value of the invention. We cannot say that the finding of a long-existing need for some such labor-saving device was clearly erroneous in view of the evidence of the cumbersome devices used for many years in building curbs.

■ There was abundant evidence of the commercial success of the machine built under the patent in suit. Almost immediately after its invention, manufacture and introduction into the market, the Canfield machine created much interest and many of these machines were sold throughout the United States and in several foreign countries. In addition to the hundreds sold by plaintiff, defendant Etnyre has admitted selling more than two hundred of its curbing machines which, except as later shown herein, are quite similar in design and function to the Canfield machines. While commercial success cannot lend validity to a patent where invention is clearly wanting, it does strongly tend "to overcome the defense that what was done was obvious to other persons of great skill shown to have been working in the same field in an effort to accomplish the same objective." Otto v. Koppers Company, 246 F.2d 789, 799–800 (4th Cir. 1957), certiorari denied, 355 U.S. 939, 78 S.Ct. 427, 2 L.Ed.2d 420 (1958).

There was evidence of recognition of the patent in suit by others in the industry. At least one accused infringer recognized validity and consented to the entry of a court decree enjoining further infringement. Another concern voluntarily entered into a license agreement under the Canfield patent. Etnyre, now manufacturing and marketing the accused machines, unsuccessfully sought a license under Canfield and now takes the inconsistent position that all that was valuable in the Canfield combination patent had been old for half a century.

■ We reach the conclusion that the patent in suit is valid and represents invention by bringing together, in combination, the elements necessary to accomplish a real innovation in the industry. The patent laws are designed to furnish protection for such innovations.

## INFRINGEMENT

From the evidence it is readily apparent that all, save one, of the essential elements of the plaintiff's curb machine are embodied in the Etnyre machines. Each has a hopper, an elongated curb mold connected together by a pipe (the pipe-shaped lower portion of Etnyre's hopper forms part of its pipe), containing a screw which is powered by driving means and which takes material from the hopper and then conveys and extrudes it into the mold where it is forcibly shaped and worked into the form of a curb which is surface finished by movement over the formed curb. Each machine is propelled forwardly by the reactive force of the extrusion of curbing material in proportion to the amount of material forced into the mold. Each is a self-contained unit. The functioning of these same elements effects the same result—a satisfactory curb from each machine.

This is not to say that the machines are absolutely identical in appearance or structural design. There are differences. The Etnyre machine is heavier; the mold is at the rear side of the Etnyre machine rather than in the rear center as in the Canfield machine; Etnyre's device is equipped with an agitator in the hopper and the heat generated by the exploded gases from the internal combustion engine is utilized through a jacket to heat the mold, a device which Canfield does not employ. Drawings illustrating the operating mechanisms of both machines were in evidence and were explained by testimony. We conclude that the addition of nonessentials to the Etnyre accused machines, such as the agitator and the heat jacket for the mold, would have no bearing on the issue of infringement.

The patent in suit is a combination patent and to establish infringement the plaintiff must show that every essential element of the combination, or its equivalent, is embodied in the accused machine. However, since every element of the plaintiff's combination is old and known to the prior art, infringement is avoided if any essential element of the combination, or its equivalent, is omitted by the defendants. See the recent decision of this court in Entron of Maryland, Inc. v. Jerrold Electronics Corporation, 295 F.2d 670 (4th Cir. 1961), and cases therein cited.

In order to meet the charge of infringement, defendants invoke the doctrine of file wrapper estoppel and assert that the proceedings in the Patent Office resulting in the allowance of claims 1, 3 and 4 are dispositive of this issue. Apparently the District Court made no specific finding with reference to this theory of defense.

There can be no doubt that Canfield, in his original application, was seeking a patent for a machine operable on either wheels or skids. This is obvious from an examination of the specifications and application claims 4 and 14. Moreover, responsive to the examiner's action, all claim of operation of the machine by sliding on skids was abandoned. Claims for an invention once abandoned, canceled or surrendered to meet the examiner's objections may not be reasserted at the whim of the patentee. Keystone Driller Co. v. Northwestern Engineering Co., 294 U.S. 42, 48, 55 S.Ct. 262, 79 L.Ed. 747 (1935). In Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 217–218, 61 S. Ct. 235, 238, 85 L.Ed. 132 (1940), rehearing denied, 312 U.S. 714, 61 S.Ct. 727, 85 L.Ed. 1144 (1941), we find the following:

"* * * But the particular invention to which the patentee has made claim in conformity to the statute is not always to be ascertained from an inspection of the specifications and claims of the patent alone. Where the patentee in the course of his application in the patent office has, by amendment, cancelled or surrendered claims, those which are allowed are to be read in the light of those abandoned and an abandoned claim cannot be revived and restored to the patent by read-

ing it by construction into the claims which are allowed."

Each application claim was amended to provide for *vertically adjustable wheels*. Claim 1 as finally allowed specifies at least one front wheel and *a pair of vertically adjustable wheels near the rear*. While claims 3 and 4 do not mention or describe the location or number of wheels, claim 3 specifies "vertically adjustable wheels mounted in the framework for adjusting the *vertical position of the frame relative to the surface* on which it is supported" and claim 4 provides for "a plurality of wheels mounted in the framework *for holding all portions of the framework out of contact with the surface* over which the framework is adapted to travel." (Emphasis in the above quotations is supplied.)

The basis for the rejection of the original claims, whether right or wrong, is not open to inquiry here. A dissatisfied applicant for a patent is protected against arbitrary rejection of his claims and he should pursue his remedy by appeal. Hubbell v. United States, 179 U.S. 77, 83, 21 S.Ct. 24, 45 L.Ed. 95 (1900). The examiner allowed the claims here in suit in the asserted belief, enthusiastically accepted, adopted and supported by the applicant, that such a machine as described would not be self-propelled without a full set of wheels. It simply would not, they believed, have enough "push" from the extruded material.

The plaintiff seeks to find novelty in its machine in that vertically adjustable wheels not only provide mobility but permit control of the compaction of the material. For example, when laying curb on a down grade, the machine has a tendency to move under less force due to gravity. If it moves too fast, that is, faster than the material is packed into the mold, the curb-forming material may not be sufficiently compacted. To compensate, the frame may be adjusted into greater contact with the ground surface to create additional frictional resistance between the machine and the ground. Conversely, when going up grade, it may

be desirable to adjust the wheels to reduce the frictional resistance and maintain desired compaction. While the machine normally tends to move forward in a straight line, when laying curb on a curve, the wheeled frame may be adjusted to give frictional resistance to skidding or skewing as the machine is guided from its normally straight path into the desired curve path. But these ideas, consistent with operation on skids, were obviously abandoned in the Patent Office and cannot now be resurrected to bolster the claim of novelty. We must look to the claims themselves as issued and now in suit in the light of cancellation and abandonment of some and the amendment and allowance of others. As stated in 40 Am.Jur. Patents, § 95, p. 594,

> "A claim must be limited, where it is a combination of parts, to a combination of all the elements included in the claim as necessarily constituting that combination. A combination is always an entirety; the patentee cannot abandon a part and claim the rest; he must stand by his claim as he has made it. Having included an element in his claims, he may not assert that it is immaterial, or that a device which dispenses with it is an infringement, although it accomplishes the same purpose in, perhaps, an equally effective manner. * * * Again, the patent must be held to be limited to the special construction or arrangement which is set forth in the patentee's claim. * * *"

The claims must be carefully scrutinized to determine if they read upon the accused machines. In view of the proceedings in the Patent Office, the inclusion of wheels in each claim must be considered as adding one more essential element to the patented combination.

Etnyre has been manufacturing its machines since 1955 and, as has been shown, all of the elements of the plaintiff's machine, with the possible exception of the vertically adjustable wheels, are incorporated in the accused machines. Insofar as we can determine

from the record, the early models manufactured and sold by Etnyre appear to infringe at least claims 3 and 4 of plaintiff's patent.

Infringement of Claim 1 is not found in any of the accused machines since they are not now and have not been equipped with a *pair of vertically adjustable wheels near the rear* of the framework. However, it is clear that some of the early Etnyre machines were equipped with two front wheels and one rear wheel, all vertically adjustable. Literature published and distributed by Etnyre to advertise its early models contains the following descriptive references: "Wheels are adjustable for compaction control and maneuverability. Front wheels are steerable." "All wheels are adjustable to give up to 90 per cent compaction or clearance for travel." In later advertising literature, the earlier references to wheels were eliminated and the following references were made: "Adjustable height, steerable front wheels make it easy to follow curb line. All wheels are adjustable to give clearance for travel." "The wheel at rear is for transporting the machine and is raised from pavement when operating."

It was undisputed that all of the Etnyre machines were provided with rear skids and were self-propelled through the force of the extruded material even when operating on the front wheels and the rear skids with the sides of the mold in contact with the ground or pavement surface. There was testimony to indicate, however, that the one rear wheel at the side of the mold on the early Etnyre machines and the two front wheels could be vertically adjusted so as to adjust the vertical position of the frame relative to the surface, as provided in claim 3, and adjusted for holding all portions of the framework out of contact with the surface, as provided in claim 4. It follows that such wheeled machines would infringe claims 3 and 4.

There was further testimony, apparently undisputed, that on later Etnyre models, the rear wheel is mounted so that it can be used for transportation only and, when down to support the machine, it is behind the mold, thus riding over and destroying the curbing made by the machine. If the design is such that the accused machine is operable *only* on skids and without the aid of the rear wheel, we perceive no infringement of any of the claims in suit, since one of the essential elements of the patented combination is lacking.

 We conclude that the issue of validity must be decided in favor of the plaintiff. On the issue of infringement in view of the proceedings in the Patent Office, we think the District Court erred in failing and refusing to apply the doctrine of file wrapper estoppel and in awarding plaintiff its attorney fees. The case will be remanded with direction that the District Court make further findings on the infringement issue consistent with the views herein expressed.

Affirmed in part, reversed in part and remanded.