Oliver F. MARSTON, Appellant,

v.

J. C. PENNEY COMPANY, Inc.,
Appellee.

Oliver F. MARSTON, Appellee,

v.

J. C. PENNEY COMPANY, Inc.,
Appellant.

Nos. 9691–9692.

United States Court of Appeals
Fourth Circuit.

Argued Feb. 5, 1965.

Decided Dec. 7, 1965.

J. Hanson Boyden and Alfred P. Ewert, Washington, D. C. (Herndon P. Jeffreys, Jr., Richmond, Va., on the brief) for appellant in No. 9691 and appellee in No. 9692.

W. Brown Morton, Jr., Washington, D. C. (Edward A. Marks, Jr., Richmond, Va., and John T. Roberts, Washington, D. C., on the brief) for appellee in No. 9691 and appellant in No. 9692.

Before HAYNSWORTH, Chief Judge, BOREMAN, Circuit Judge and CHRISTIE, District Judge.

BOREMAN, Circuit Judge.

This is a patent infringement suit in which Oliver F. Marston, owner of United States Letters Patent No. 2,715,231, claims that J. C. Penney Company, Inc. (herein called Penney), infringed Claims 1 and 2 of his patent by selling [1] in its

---

1. 35 U.S.C.A. § 271 provides in part: "(a) * * * whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent." (Emphasis added.)

Virginia stores a chaise longue manufactured in West Germany which embodied his inventive concept. As relief Marston sought an injunction against further infringement, an accounting and damages for past infringement and attorney fees. Penney in defense asserted that Claims 1 and 2 were invalid and denied infringement. The District Court held that Claims 1 and 2 of the patent were valid but were not infringed by the accused article. Each side has appealed from the holding adverse to it.

The patent in question was issued to Marston on August 16, 1955, and is titled "Flexible Buoyant Article." The specifications of the patent state that "this invention relates to flexible, waterproof, buoyant structures, and articles made therefrom, such as cushions, mattresses, life preservers, pillows, floats, bumpers, insulation units and the like." Claim 1 of the patent reads as follows:

"1. A buoyant, flexible filler pad comprising a plurality of strip portions arranged in laterally disposed relation, each said strip portion comprising a tube of flexible thermoplastic resinous material having opposed parts of the tube wall completely united together in fluid sealing relation at spaced intervals to form an individually sealed link section between each adjacent pair of sealed parts, each said sealed part of one strip portion being arranged in laterally aligned relation to a sealed part of an adjacent strip portion to form a plurality of laterally disposed rows of aligned sealed parts in said pad, and a connecting strip overlying each said row of sealed parts and united to each sealed part in said row, each said link section being in spaced relation to adjacent link sections of laterally disposed strip portions to provide fluid circulating openings therebetween extending perpendicularly through said pad."

Claim 2, the only other Claim with which we are here concerned, differs from Claim 1 in three respects. First, the strips of individually sealed cells or sections are to be arranged in "parallel laterally aligned relation"; second, the tube walls are continuous in cross section; and, third, the tube walls are to be united together by heat sealing and the connecting strip overlying each row of these aligned sealed parts is to be united to the sealed parts by heat sealing. For these reasons the District Court concluded that Claim 2 was somewhat narrower in scope than Claim 1.

The construction process used in making the flexible buoyant filler pad described in Claims 1 and 2 is more easily understood from the patent's specifications and drawings. Compressed air or nitrogen is introduced into tubing, preferably of extruded flexible thermoplastic resin composition such as polyethylene. The opposed walls of the tubing are then pinched together and sealed (Claim 2 specifies heat sealing) at spaced intervals to form a chain of airtight cells resembling sausage links or, in other words, the tube walls are united together in fluid sealing relation. The pinching is done in such a manner that the sealed areas form flat surfaces. The tubing is then cut into strips of a predetermined length depending upon the desired dimensions of the completed article. The cut is made at any one of the sealed parts, each such sealed part being of sufficient width so that a sealed area remains on either side of the line of severance to prevent the air or gas from escaping from the cell on each side of the cut. The numerous strips of airtight cells are arranged, as stated in Claim 1, in laterally disposed relation or, as stated in Claim 2, in parallel laterally aligned relation so that the sealed parts of the several strips of airtight cells form laterally disposed rows of aligned sealed parts. Strips of a thermoplastic resin composition are then placed over each row of aligned sealed parts and united to each said row (Claim 2 specifies heat sealing) with the result that the individual rows of airtight cells have been connected together and form a single unit.

The finished product has openings between each row of airtight cells which permit the free circulation of fluid or air. This feature is a result of the particular arrangement of the sealed parts in relation to each other and the manner in which the tubing is sealed. The flat area where the opposed walls of the tubing are sealed together is greater in width than the airtight cells; consequently, the sealed parts of the various strips can be contiguous and still leave openings between the rows of airtight cells for circulation. A pad constructed in the described manner is waterproof, self-ventilating, sanitary and inexpensive to manufacture; it has individual permanently inflated airtight cells which make the structure buoyant and comfortable to sit on with openings between the cells which provide for drainage and air circulation so that the pad dries rapidly and remains cool. The amount of buoyancy depends upon the size of tubing used in the construction process, the length of each airtight cell and the width of the sealed portions.

## PATENT OFFICE HISTORY

Marston's original application was filed in September 1953 and set forth sixteen claims. Each claim was largely based upon a single element of the particular combination described in the patent in suit. The Patent Office, after making an examination which revealed twelve patents in similar or related arts,[2] rejected all sixteen claims. The grounds for rejection and the patents primarily relied on are stated in a portion of the Examiner's report set out in the margin.[3]

Marston responded to this official action by filing an amended application on October 1, 1954, in which he requested the cancellation of prior claims and the substitution of four new claims. Each of these four claims was a combination of the individual elements contained in Claims 1–16 which had been rejected. Marston's attorney stated in the amended application:

"Each of new claims 17, 18, 19 and 20, define the sealed parts or portions of the tubular strips as be-

2. UNITED STATES PATENTS

| Name | Patent No. | Date Granted |
|---|---|---|
| Kohler | 1,990,434 | Feb. 5, 1935 |
| Picard | 2,171,805 | Sept. 5, 1939 |
| Walters | 2,350,654 | June 6, 1944 |
| Bailhe | 2,405,484 | Aug. 6, 1946 |
| Cart | 2,542,477 | Feb. 20, 1951 |
| Biefeld | 2,660,736 | Dec. 1, 1953 |

FOREIGN PATENTS

| | | |
|---|---|---|
| DuPont (French) | 379,662 | Nov. 15, 1907 |
| Riviere (French) | 389,972 | Sept. 23, 1908 |
| Banks (British) | 563,014 | July 26, 1944 |
| Johansen (British) | 657,558 | Sept. 19, 1951 |
| Drepper (German) | 857,758 | Oct. 9, 1952 |
| Saiac (French) | 955,651 | Jan. 7, 1950 |

3. "Claims 1–3 inclusive are rejected as fully met by Drepper or Saiac.

"Claims 4–13 inclusive are rejected as unpatentable over Drepper or Saiac. Drepper shows a covering 6 for tubes 1 of plastic material and sealed at 2 by a heat means. As shown in Figure 2 the tubes are arranged in 'parallel laterally aligned relation.' Similarly, Saiac shows tubes 1 of plastic material sealed at 3 to form buoyant chambers. With respect to claim 11, attention is directed to Biefeld which shows it is a common expedient in the art to use a covering of fire resistant composition.

"Claims 14–16 are rejected as unpatentable over Drepper taken with French 379,662. French 379,662 teaches a cushion wherein the tubes b are concentric * * * or in coil form * * *. No invention is involved in forming the tubes of Drepper in the form taught by French 379,662."

ing arranged in a plurality of laterally disposed rows of aligned sealed parts or portions, and a connecting strip overlying each such row and united to each sealed part in the row, each of the link sections being in spaced relation to adjacent link sections of laterally disposed strips to provide fluid circulation openings therebetween extending perpendicularly through the pad."

Referring to the Drepper and Saiac patents cited by the Examiner, the attorney stated that Drepper, while disclosing a tube divided into cells by joining portions of the tube walls together, did not disclose the use of a thermoplastic resinous material and did not disclose the specific structure referred to in the above quoted paragraph. As to Saiac, he stated that it disclosed the use of rubber only, made no disclosure of the specific arrangement of tube strips as stated above, and was distinguishable for the same reasons as Drepper. The Patent Examiner determined that the amended application disclosed patentable invention and the four new claims were approved, the first two of which are here involved.

At the time Marston made the claimed invention he was an officer of the B. T. Crump Company of Richmond, Virginia. This company manufactured a diversified line of merchandise, including furniture items such as hassocks, seat covers and outdoor furniture. Marston attempted to interest this company in taking a license under the patent. The company took a six months' option for a license which was renewed for an additional six months, but at the end of this period company officials elected not to exercise the option. Since that time Marston has attempted to interest others in becoming licensees but so far has been unsuccessful.

## PRIOR ART

In its effort to have Claims 1 and 2 declared invalid, Penney introduced in the lower court twenty prior patents consisting of the twelve cited in footnote 2 and eight patents discovered by an independent search.[4] The lower court examined all of this prior art and made specific findings relating to the eight patents not considered by the Patent Office and to Saiac, French Patent No. 955,651, the patent which the court found most nearly anticipated Marston's claimed invention. The court concluded, however, that Marston's claims differed from the teachings of Saiac and the cited prior art, stating:

"Some of the prior patents in both groups show individual features of Marston's design. Certain ones disclose tubes sealed at intervals but none of them suggests Marston's complete combination and arrangement of parts. The primary inventive concept found in Marston's article was to provide tubes sealed at intervals to form cells and to arrange the sealed portions in lateral alignment to form rows. Marston achieved alignment by a connecting strip overlying each row of sealed parts and united to each sealed part.

4. UNITED STATES PATENTS

| Name | Patent No. | Date Granted |
|---|---|---|
| Lee | 487,419 | Dec. 6, 1892 |
| Kopec | 1,262,358 | April 9, 1918 |
| Frey | 1,361,453 | Dec. 7, 1920 |
| Manson | 2,046,335 | July 7, 1936 |
| Romanoff | 2,154,640 | April 18, 1939 |
| York | 2,575,987 | Nov. 20, 1951 |

FOREIGN PATENTS

| | | |
|---|---|---|
| Ideal-Steppdecken-Fabrik (German) | 608,752 | Jan. 31, 1935 |
| Chaisemarten (French) | 784,624 | April 29, 1936 |

These features are not disclosed by the prior art."

While admitting that none of the prior patents identically discloses Marston's combination, it is Penney's position here that Claims 1 and 2 are invalid because they lack invention as the patented article described in the claims is an obvious combination of elements which were present in the prior art. This argument is merely a restatement of one of the statutory tests for determining patentability as contained in 35 U.S.C.A. § 103. That section provides in pertinent part:

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. * * *"

To show the obviousness of Marston's claims Penney, in its brief, relies mainly upon five of the twenty patents which it introduced in the lower court. Two of the five, Saiac and French Patent No. 379,662, were considered by the Patent Examiner. The other three, Kopec, York and Lee, were discovered by Penney. Even though Penney does not seem to rely upon the other fifteen patents, we felt compelled to examine them. In view of this apparent lack of reliance, however, we do not think it necessary to state here the details of those patents and their effects upon Claims 1 and 2 except to tersely say that those patents do not reveal anything importantly significant to the present inquiry.

Before proceeding to briefly discuss the five patents Penney has classified as being the most relevant perhaps some comment should be made concerning the issue of whether rubber, as specified in some of the prior art, is a "thermoplastic resinous material," the latter being the type of material specified in Claims 1 and 2. In the court below the testimony of the expert witnesses was conflicting and the court failed to make a finding on this issue. Here, the parties continue the debate. Resolution of this question in our view is not crucial to a decision on validity. We do not think Marston was granted a patent because he used a plastic material, although the use of it in the combination made the resulting product more practical and less expensive to manufacture. Instead, we think the patent was granted because Marston used a new and different combination and arrangement of various elements to produce a better product. From the action taken in approving the amended claims, that would seem to be the position taken by the Patent Office and it was certainly the position taken by the District Court in sustaining validity.

As the District Court found and Penney agrees, Saiac (French Patent No. 955,651) most nearly anticipates Marston's claimed invention. This patent describes a pneumatic mattress. The mattress is made from a number of tubes which are filled with air or a neutral gas. The claims of the patent do not specify the material from which the tubes are made but the specifications state that they are to be made of plastic or elastic material such as rubber. The tubes are juxtaposed and glued together at their tangential point or line. Then the tubes are pinched together at intervals dividing each tube into a string of small airtight cells or compartments. A sheet of rubber is then glued to each side of the structure and the resulting product is a lightweight mattress. If a thick mattress is desired, several units made in the manner described above can be superposed with each individual row or tier of the tubes running in the same or in a crossed direction.

From the above description it is clear that Saiac does contain certain elements of Marston's patent. It discloses the idea of using tubes filled with air or gas and pinching the walls of the tubes

together at intervals to form airtight cells. On the other hand, this patent does not teach aligning the sealed parts of the tubes in rows and placing a strip over each row of aligned sealed parts to connect the individual tubes together. In fact, the tubes in Saiac are glued together at their tangential point or line and no strips of any kind are used to hold them together. Glued in this fashion and then enclosed on each side by sheets of rubber eliminates any space between the airtight cells for circulation, a particularly important and distinguishing feature of Marston's arrangement.

The Lee patent, No. 487,419, has elements similar to those disclosed by Saiac but the elements are used for a different purpose. This patent relates to an india rubber tire for bicycles and other velocipedes. The end product is a tire with permanently inflated individual airtight cells contained within an outer covering. Like Saiac, Lee discloses certain things which Marston included in his patent. Inflated tubes are pinched together at intervals to form airtight compartments which remain permanently inflated. But there the similarity ends for Lee does not disclose the use of connecting strips or the particular arrangement described in Claims 1 and 2.

Kopec, Patent No. 1,262,858, describes a lifesaving suit. The suit is made from a number of pneumatic tubes, preferably of rubber, arranged in parallel relation. The individual tubes are joined together by a strip of material extending across the ends of the individual tubes. Arranged on the two binding strips are devices such as buttons and buttonholes for fastening the opposite ends of the structure together when it is placed around the trunk portion of the body. On the portion of the structure covering the back a protective apron is placed. This apron may be attached to the top tube and used as a liner or it may be attached to the top tube and wrapped around the adjacent tubes. Straps, placed on the top and bottom tubes, are used to secure the suit to the legs and shoulders. Each individual tube has a valve which permits it to be inflated to any desired degree. Although Kopec reveals inflated tubes arranged in parallel relation and spaced apart so that water can freely circulate between them, this patented article does not have tubes pinched together at spaced intervals to form airtight cells, has no connecting strips, and the patent fails to disclose the particular arrangement Marston describes in Claims 1 and 2.

French Patent No. 379,662 (DuPont) describes a pneumatic or hydraulic cushion which may be made in two ways. First, one continuous tube of a nonspecified material may be wound in a spiral or, second, several tubes may be arranged concentrically. In the latter case, the individual tubes are connected together by tubulures which permit the inside tubes to be inflated by using a valve attached to the outside tube. If a single tube wound in a spiral is used, the tube is simply terminated by a valve attached to the end of the tube that is used to inflate the structure. The structure resulting from either method of construction is attached to a base of sheet rubber or other suitable material. This base may have perforations in it to permit circulation. The basic similarities between this patent and Marston's are that both describe cushions, both use inflated tubes, and both are constructed in a manner to allow circulation. This patent, however, does not have permanently inflated tubes with opposed parts of the tube walls sealed together at intervals to form airtight cells; it has no sealed parts and the manner in which circulation is achieved is entirely different from the way Marston accomplishes this result.

Penney insists that York, Patent No. 2,575,987, literally discloses the construction process used by Marston and contains every element of his patent except that it is not a buoyant, flexible, filler pad. York claims invention of a heating element for an electric blanket. The element is made from a series of rubber

strips which can hardly be called tubes. Each of these strips consists of three plies of vulcanized rubber and, in some, wires are embedded which connect with temperature sensitive devices. These strips are arranged in grid fashion as some of the strips are aligned in one direction and others in an opposite or crossed direction. Where the strips cross each other they are vulcanized together. The resulting grid structure is attached to a sheet of loosely woven mesh material such as cheesecloth and inserted into a blanket. We adopt the District Court's conclusory statement:

> " * * * It [this patent] does not disclose tubes or opposed parts of a tube wall completely united together at spaced intervals to form individual sealed link sections. It is designed for electrical heating and makes no reference to individually fluid-sealed cells."

### VALIDITY

■ Where validity is at issue we start with the basic proposition found in 35 U.S.C.A. § 282 that a properly issued patent is presumed to be valid and the burden of establishing invalidity rests upon the party asserting it. This presumption is strengthened where the principal references urged against the patent were considered by the Patent Office, Power Curbers, Inc. v. E. D. Etnyre & Co., 298 F.2d 484 (4 Cir. 1962), and conversely it is weakened or destroyed where relevant art was not cited or considered. Heyl & Patterson, Incorporated v. McDowell Company, 317 F.2d 719 (4 Cir. 1963). In the present case, Penney seems to rely on only three of the eight patents not considered by the Patent Office. We reach the conclusion that the other five do not have any effect on the presumption. Of the three references only two, Kopec and Lee, faintly suggest pertinency. But Lee, as stated earlier, does not disclose any element which Marston incorporated in Claims 1 and 2 which was not disclosed by Saiac, a patent which was considered by the Patent Office and the one which most nearly anticipates Marston's invention. Under these circumstances we do not think the failure to consider Lee would weaken the statutory presumption. Kopec, on the other hand, does reveal a structure different from other patents considered by the Examiner but this patent, in our judgment, does not reveal anything of great significance and again we conclude that the failure to consider it does not materially weaken the presumption.

■ From the prior art and from the action taken by the Patent Office on Marston's original and amended applications, it seems clear that Claims 1 and 2 can be sustained, if at all, only as a combination patent in which the basic elements were old. But as Penney concedes and the lower court correctly found, none of the prior patents discloses Marston's complete combination and arrangement of parts. Identical disclosure or the lack of it, however, is not the test of patentability. 35 U.S.C.A. § 103. The validity of a combination patent, as this court has said, depends upon whether it was obvious to one possessing ordinary skill in the art to piece together the combination in the same way as did the claiming inventor. Entron of Maryland, Inc. v. Jerrold Electronics Corp., 295 F.2d 670, 674 (4 Cir. 1961). See also, Marvel Specialty Company v. Bell Hosiery Hills, Inc., 330 F.2d 164, 171 (4 Cir. 1964). If such obviousness is present the law will not favor granting the claiming inventor a monopoly and the resulting privilege of exacting a tax from industry. Berry Brothers Corporation v. Sigmon, 317 F.2d 700 (4 Cir. 1963).

The obviousness test is a difficult one to apply. As stated by Judge L. Hand in Reiner v. I. Leon Co., 285 F.2d 501, 503–504 (2 Cir. 1960):

> "The test laid down is indeed misty enough. It directs us to surmise what was the range of ingenuity of a person 'having ordinary skill' in an 'art' with which we are totally unfamiliar; and we do not

see how such a standard can be applied at all except by recourse to the earlier work in the art, and to the general history of the means available at the time. To judge on our own that this or that new assemblage of old factors was, or was not, 'obvious' is to substitute our ignorance for the acquaintance with the subject of those who were familiar with it. * * * "

An observation made in Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U.S. 428, 435, 31 S.Ct. 444, 447, 55 L.Ed. 527 (1911), is pertinent here:

" * * * Knowledge after the event is always easy, and problems once solved present no difficulties, indeed, may be represented as never having had any, and expert witnesses may be brought forward to show that the new thing which seemed to have eluded the search of the world was always ready at hand and easy to be seen by a merely skillful attention. * * * "

■ On the present record one might easily conclude that the claimed invention described in Claims 1 and 2 of Marston's patent was obvious to an ordinary person skilled in this area of the art and therefore lacks invention. It is a fact that Marston has not been successful in his attempt to exploit the patent and there is no evidence in the record to show a long existing need in this industry for such an article. However, lack of commercial success does not indicate lack of invention. Edward Valves, Inc. v. Cameron Iron Works, Inc., 286 F.2d 933, 939 (5 Cir. 1961). The burden of proving invalidity rested with Penney. In the lower court Penney elected not to call any expert witnesses to testify as to whether the prior art made Marston's claims obvious or as to the stage of development in this area of the art. Instead it chose to rely on mere argument by counsel and directed most of its evidence to the issue of infringement. While admittedly the question is a close

one, we are not persuaded that Penney has overcome the statutory presumption of validity. The prior art shows that several inventors have patented buoyant devices, pads, cushions and mattresses, by utilizing gas-filled flexible tubes which, in some instances, have been divided into individually sealed cells or sections. None of the patents whether cited by the Patent Office or not disclosed or, in our opinion, made obvious the particular combination and arrangement of the essential factors Marston incorporated in Claims 1 and 2 of his patent.

■ Penney next argues that the elements of the combination were old and the combination must produce some new result to be valid; that Marston's claimed invention does not accomplish this. The correctness of this basic premise has been recognized by this court before. Marvel Specialty Company v. Bell Hosiery Hills, Inc., 330 F.2d 164 (4 Cir. 1964); Triumph Hosiery Mills, Inc. v. Alamance Industries, Inc., 299 F.2d 793 (4 Cir. 1962); Entron of Maryland, Inc. v. Jerrold Electronics Corp., 295 F.2d 670 (4 Cir. 1961); O. M. I. Corporation of America v. Kelsh Instrument Co., 279 F.2d 579 (4 Cir. 1960). However, we are not persuaded that the combination described in Claims 1 and 2 produced no new, different or additional result and, therefore, we uphold the District Court's determination of validity.

## INFRINGEMENT

Marston's charge of infringement is directed against the flexible plastic structure incorporated in the chaise longue sold by Penney which forms the surface of the chaise that supports the user. This structure, which Penney calls the webs or webbing, is attached to a folding metal frame with adjustable legs. The frame is similar to frames of other chaises. It is made of metal tubing and consists of two side members approximately seven feet in length and two end members approximately thirty inches in width which are fitted together in the shape which

may be roughly described as that of a rectangle with rounded, rather than square, corners. On each of the side members are two adjustable hinges which separate the chaise into three sections, a back, a seat and a front extension. The legs which support the frame are connected to the frame at the same place where the adjustable hinges are placed. The metal legs, the back and the front extension can be positioned so that the chaise may be used as a chair, a cot, a hassock, or the frame can be placed directly on the ground and the webbing used as a pad or mattress.

The webbing which Marston contends incorporated his inventive concept is made from flexible plastic tubing with four connecting strips of sheet plastic running through it and connected to caps made from sheet plastic which have been drawn tightly over each end of the metal frame. Although the webbing might be said to consist of three sections corresponding to the sections of the metal frame, these sections are joined together by the connecting strips which run lengthwise through the rectangle and substantially parallel with the side members of the frame. However, the actual construction is done section by section. A piece of sheet plastic is drawn tightly over each end of the metal frame and forms a cap which extends over and along the side members a distance of approximately six inches. On the back section a single plastic tube several yards long is then wound transversely around the two side members of the metal frame between the edge of the plastic cap and the adjustable hinge separating the back and seat sections. This same process is repeated in constructing the seat and the front extension. When wound around the side members the tubing forms loops. Four connecting strips run through or between these loops from the edge of the plastic cap on one end of the metal frame to the edge of the plastic cap on the other end of the frame. The portions of each loop which may be said to overlie and underlie the four connecting strips are unit-

ed to the connecting strips by heat sealing. The opposed parts of the tube walls are pinched together and sealed at the point in each loop where the connecting strips are sealed to the loops. This process forms, in effect, four rows of aligned sealed parts with the connecting strips being sealed to the loops of tubing along these rows. It also results in the loops of tubing having airtight cells or sections between the sealed areas.

The District Court concluded that certain differences existed between the webbing constructed in the above fashion and the inventive concept described in Claims 1 and 2, differences which it felt compelled a finding of noninfringement. Each section of the accused article is composed of a single continuous plastic tube which is wound around the metal frame in loops which form two layers of plastic tubing. Marston's patent teaches tubing cut into lengths or a plurality of strips; it states that there may be more than one layer of the tubing employed in the construction of an article but contemplates connecting strips overlying and sealed to each individual layer. In Penney's article the connecting strips pass between the two layers of tubing formed by the loops of the single continuous tube in each section and the two layers are sealed to the connecting strips. Penney's accused article, when constructed by winding the single continuous tube around the side members of the metal frame, forms its own attachment to the frame. Marston's patent calls for a plurality of strips which can be attached to the frame of a chair by tabs or like apparatuses. In Penney's article the connecting strips are heat-sealed to the caps of sheet plastic placed over the ends of the metal frame. Marston's patent does not claim or describe the use of sheet plastic inserted in the structure as caps.

It appears from the lower court's memorandum opinion that the reason for its conclusion may have been based on its interpretation of a paragraph contained in a case decided by this court. Johnson & Johnson v. Carolina Lee Knitting

Co., 258 F.2d 593, 597 (4 Cir. 1958). The paragraph reads as follows:

"Of course, if the defendant in fact departs from the teaching of the patent, not making a simulated departure merely while copying the essence of the patent, it cannot be held liable for infringement. * * It is equally axiomatic in the law of patents that the addition of a *useless* or *unimportant* item cannot avoid infringement, but is recognized as a frequent resort of infringers to mask their true purpose. * * * " (Emphasis supplied.)

From the latter statement it appears that the court may have reasoned that the addition of *needed* or *important* items *does* avoid infringement for it stated:

" * * * The differences between the articles are basic and are not merely the addition of useless and unimportant items."

One cannot avoid infringement by an addition to a patent even though the addition is important to the use intended for the resulting article. 1 Walker on Patents §§ 409 and 432 (6th Ed. 1929). To determine whether the accused article infringes Claims 1 and 2 we must look to the words of the claims. If every essential element of the described combination, or its. equivalent, is embodied in the chaise sold by Penney, Marston is entitled to prevail. Power Curbers, Inc. v. E. D. Etnyre & Co., 298 F.2d 484, 494 (4 Cir. 1962); Entron of Maryland, Inc. v. Jerrold Electronics Corp., 295 F.2d 670, 677 (4 Cir. 1961).

When this test is applied to the accused article we are led to the conclusion that the facts make out a case of infringement. Except for its contention that the webbing is not a buoyant filler pad, Penney has virtually conceded that the webbing does contain other elements described in Claims 1 and 2. In Penney's answer to an original interrogatory filed by Marston certain of the essential elements which we have conclud-

ed constitute Marston's invention are admitted. Penney stated:

"The chaises sold by Defendant as illustrated in Plaintiff's Exhibits A, B and C, had no cushions of any sort, seat or back. However, the material forming the seat, back and leg support webs was formed of plastic which in each web comprised a plurality of strip portions arranged in laterally disposed relation, each said strip portion comprising a tube of flexible thermoplastic resinous material having opposed parts of the tube wall united together. * * * The united parts of each strip portion are, however, arranged in laterally aligned relation to the united parts of adjacent strips to form a plurality of laterally disposed rows of aligned united parts."

Although Penney refused to admit the incorporation in the accused article of other elements of the combination described in Marston's patent, a cursory examination of chaises which were introduced as exhibits reveals these features. The walls of the plastic tubing are sealed together forming airtight cells or sections. The connecting strips follow the laterally disposed rows of aligned united parts and are heat sealed to the united parts. The sealed parts of each loop are contiguous to each other, yet openings remain between the airtight cells for circulation. True, the webbing has certain features which Marston does not describe, but the webbing itself is practically a "Chinese copy" of the structure Marston describes in Claims 1 and 2.

Penney emphasizes the argument that the preamble of Marston's claims calls for a flexible buoyant filler pad and that Penney's chaise is not buoyant and is not a filler pad. Marston has countered with the proposition that the webbing of the chaise is buoyant and that the preamble of his claims which specifies a filler pad only suggests a possible use for the claimed invention and is not a limitation upon it. The District Court determined that the webbing had no *useful* buoyancy and that it could not be

described as a filler pad, but that the preamble in this case did not limit the claims to filler pads. The court reached the conclusion that the determination of these issues was not determinative of the ultimate issue of infringement.

We agree with the lower court that the preamble of these claims does not constitute a limitation upon them. In this connection, the following principles appear to us to be pertinently applicable. If the preamble merely states a purpose or intended use and the remainder of the claim completely defines the invention independent of the preamble, it is not a limitation on the claims. On the other hand, if the claim cannot be read independently of the preamble and the preamble must be read to give meaning to the claim or is essential to point out the invention, it constitutes a limitation upon the claim. See Kropa v. Robie, 187 F.2d 150, 38 C.C.P.A. Patents 858 (U.S.Ct.P.A.1951). In the present case the preamble does not describe a unique article to which the claim alone is referable, cf. Benoit v. Wadley Co., 54 F. 2d 1041 (7 Cir. 1932), and the preamble is not essential to a reading and understanding of the claim. The invention arises from the combination and arrangement of the various elements described in the claims and the portion of the claims following the preamble is a self-contained description of the invention. The fact that Penney's chaise has no *useful* buoyancy is immaterial for the evidence clearly revealed that the webbing is buoyant. *Useful buoyancy* of the manufactured article is not the test since the specifications described articles where buoyancy in and of itself would be of no significant value.

The finding of validity is affirmed, but the finding of noninfringement will be reversed for the reasons herein stated. As the lower court did not consider the issue as to damages arising from infringement, the case will be remanded for further appropriate proceedings consistent with the views herein expressed.

Affirmed in part, reversed in part and remanded.